UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| SAMMIE O. NEEDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 4:10-CV-00040-TWP-WGH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Sammie O. Needham ("Needham"), requests judicial review of the decision of

Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the

Commissioner"), denying Needham's applications for Supplemental Security Benefits ("SSI")

and Disability Insurance Benefits ("DIB") for the requested closed period of disability from

March 1, 2005 through March 15, 2007, and the requested extended period of disability

beginning on January 9, 2009. For the reasons set forth below, the Commissioner's decision is

**AFFIRMED**.

## I. BACKGROUND

Needham was born on August 20, 1960, making him 44 years old at the time of the

alleged onset date and 48 at the time the Administrative Law Judge rendered his decision. He

completed high school (R. at 451) but attended mostly special education classes. (R. at 466). He

is married and has a son. (R. 450-51).

## A. PROCEDURAL HISTORY

Needham filed applications for SSI and DIB effective October 4, 2005, alleging that he became disabled on March 1, 2005, due to symptoms associated with a ruptured disc in his lower back and depression.  His applications were denied initially and upon reconsideration.  On May 5, 2009, after failing to appear at a previously scheduled hearing, Needham appeared with counsel and testified at a hearing before Administrative Law Judge Larry Temin ("the ALJ").  On May 20, 2009, the ALJ issued his decision finding that Needham was not disabled because he was able to perform jobs that existed in significant numbers in the national economy.   On February 26, 2010, the Appeals Council denied review of the ALJ's decision, at which point the ALJ's decision became the final decision of the Commissioner.

## B. MEDICAL HISTORY

Needham received medical treatment from R. Keith Jarman, M.D. from March 2003 to January 2005.  (R. at 201-72).  Dr. Jarman's treatment records assessed Needham with chronic lumbar strain, a herniated lumbar disc, and intermittent symptoms of sciatica.  (R. at 201-72).  A June 2, 2003 MRI revealed broad based disc protrusion at L3-4 along with hypertrophic changes of the facets resulting in borderline canal stenosis and some encroachment on the inferior aspect of the left neural foramen.  (R. at 291).  There were no findings of nerve root impingement.  (R. at 291).  The MRI also revealed a broad based protrusion at L4-5 with evidence of some annular disruption centrally, but without focal disc herniation or spinal canal stenosis (R. at 291); a moderate bilateral formainal encroachment at L4-5, also without definite nerve root impingement (R. at 291); a right paramedian shallow contained disc herniation stable at the L5-S1 level (R. at 291); and progression at L2-3 with diffuse disc bulging or broad based protrusion.  (R. at 291).  A June 10, 2003 MRI revealed L3-L4 (Central protrusion, Canal stenosis); L4-L5 (Central

protrusion, right left foraminal stenosis, degenerative spondylosis); L5-S1 (left lateral disc herniation); and progressive degenerative changes since Needham's previous exam in 1998. (R. at 247). A herniated lumbar disc without correlating sciatica or nerve root tension was also reported. (R. at 247).

In February 2004, Needham visited John M. Roberts, M.D. with complaints of lower back pain and left leg pain. (R. at 182). On March 25, 2004, Dr. Roberts obtained an updated MRI of Needham revealing "multiple highly degenerated discs throughout the lumbar spine," although none produced compressive pathology. (R. at 286). At that time, Dr. Roberts was of the opinion that there was nothing that was surgically correctible. (R. at 286). The doctor stated, "His problem is so widespread that chronic pain management is probably the only beneficial approach for him to take…I regret there is nothing we can do to help him, but hopefully we can steer him in the right direction." (R. at 286).

Needham visited Alan R. Kohlhaas, M.D. on September 27, 2004, reporting that he injured his back while taking apart a skid. (R. at 185). Needham saw Thomas Carothers, M.D. from April 2005 to July 2005. (R. at 188-94). Dr. Carothers diagnosed Needham with degenerative lumbar disc disease (R. at 188-94), but advised that there was "very little to offer him with minimal disc protrusions and multi level involvement." (R. at 189).

An April 5, 2005 MRI performed on Needham by James Browne, M.D. revealed a small right paracentral disc herniation at the L5-S1 level. (R. at 196). The disc was found to abut and mildly encroach the right S1 nerve root, although no significant associated central stenosis was suspected. (R. at 196). Also found were an annular tear and associated small central disc protrusion at the L2-L3 level with associated facet and ligamentum flavum hypertrophy encroaching upon the canal; spondylotic change associated with a right foraminal disc protrusion

at the L4-L5 level; additional spondylitic changes resulting in some moderate bilateral neuroforaminal narrowing; and additional mild-to-moderate spindylotic changes. (R. at 196). No high-grade central or neuroforaminal stenosis was suspected. (R. at 196). Another MRI performed on Needham by Dr. Carothers on April 8, 2005 revealed small central disc protrusions from L2-3 to L5-S1 with decreased signal at all of these levels. (R. at 192). There was also a Schmorl's node with protrusion of disc material into the inferior endplate of L3 and a right paracentral and lateral disc protrusion at L4-5. (R. at 192).

From October 2005 through March 2006, Needham received medical treatment from Gary E. Scudder, M.D. (R. at 339-47) for back pain associated with a herniated disc at L5-S1 (R. at 339-45), left knee pain (R. at 339), a hand tremor (R. at 341), and depression and anxiety (R. at 344). On November 29, 2005, Robert Kurzhals, Ph.D. conducted a mental capacity examination on Needham and reported that Needham had major depressive disorder and provisional borderline intellectual functioning. (R. at 299). Dr. Kurzhals also noted that Needham demonstrated adequate effort and persistence in the Mental Status Exam and had a GAF of 48. (R. at 299).

In a Psychiatric Review Technique form completed on December 17, 2005 (R. at 348-61), Dr. Grange diagnosed Needham with depression (R. at 351) and assessed the following functional limitations: Mild Restrictions of Activities of Daily Living; Mild Difficulties in Maintaining Social Functioning; Moderate Difficulties in Maintaining Concentration, Persistence, or Pace; and no Episodes of Decompensation of extended duration. (R. at 358). Dr. Grange also conducted a Mental Residual Functional Capacity Assessment. (R. at 362-64). Needham demonstrated moderately limited abilities to understand, remember, and carry out detailed instructions, but no other significant mental limitations were assessed. (R. at 362).

Michael W. Kennedy, M.D. issued a disability evaluation of Needham on January 18, 2006. (R. at 318-22). Dr. Kennedy's impression was of degenerative disc disease, depression, and essential tremor. (R. at 321). In his report, Dr. Kennedy stated, "In regard to the workplace, claimant does not appear to be a suitable workplace candidate at this time because of back pain." (R. at 322). Needham underwent a neurological examination for "shaky hands" by Arthur L. Hughes, M.D. on February 2006. (R. at 325-26). Dr. Hughes reported a mild essential tremor, noting "very slight low amplitude rapid head tremor, slight tremor of the outstretched hands, tremor on finger to nose testing, but not tremor at rest." (R. at 325).

L. Bastnagel, M.D. conducted a Physical Residual Functional Capacity Assessment of Needham on February 23, 2006. (R. at 328-35). Dr. Basnagel reported Needham's capabilities as follows: He can "Occasionally lift and/or carry 20 pounds;" "Frequently lift and/or carry 10 pounds;" "Stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday;" "Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday;" "Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry" (R. at 329); "Occasionally" climb ramp/stairs, stoop, kneel, crouch, and crawl; "Frequently" balance; and "Never" climb ladder/rope/scaffolds. (R. at 330). No manipulative, visual, communicative, or environmental limitations were established. (R. at 331-32). Dr. Bastnagel noted postural limitations, shuffling gait, loss of motion of the lumbar spine, positive straight leg raising findings, and a tremor in both hands. (R. at 328-36). This opinion was affirmed as written by M. Brill, M.D. on April 20, 2006. (R. at 335). No state agency examinations have been performed after Needham left his employment in 2009.

Needham visited Eugene Groysman, M.D. on April 7, 2008, complaining of atypical chest pain. (R. at 398). He was sent to the emergency room (R. at 399) and hospitalized for two

weeks. (R. at 375). He underwent cardiac catheterization and was diagnosed with two vessel coronary artery disease and unstable angina. (R. at 375). Needham also underwent placement of a stent in the mid-right coronary artery. (R. at 375).

## C. THE ADMINISTRATIVE HEARING

### 1. <u>Needham's Testimony</u>

At the hearing on May 5, 2009, Needham testified that he has worked consistently for twenty-seven years (R. at 468), but that his current source of income is unemployment benefits. (R. at 454). Needham was let go from work in 2005 because his back pain prohibited him from performing his duties. (R. at 468). He could not have maintained a sit down job because he was unable to sit for more than ten or fifteen minutes. (R. at 468). Needham described the pain as feeling "like somebody chops you in half with a sword." (R. at 469). Between 2005 and 2007, Needham and his son were kicked out of two apartments because Needham could not pay the rent. (R. at 467). As a result, Needham and his son were homeless for three months before Needham decided to return to work. (R. at 467). Needham stated that he was able to return to work because the two-year break had helped his back. (R. at 467).

Needham testified that from March 2007 to January 2009 he worked for TFE Logistics but stopped working there because the company moved its plant to South Carolina (R. at 454-55). There, Needham's first position required him to stand at a table and put clothes on hangers and then into a box. (R. at 469). After an hour of this work, Needham informed his employer that he could not do that job because his back was hurting too badly. (R. at 469). Needham was then reassigned to work as a "mini pickup," which involved walking around and picking up clothes out of bins, putting them in a box on a cart, and taking them to a skid. (R. at 470). Needham was able to perform at this position for about six months before Needham asked to be

reassigned because of his back pain. (R. at 470). Needham next became the operator of a cherry picker forklift. (R. at 455). This position required very little lifting, maybe five to ten pounds. (R. at 455). Needham was also able to sit some (R. at 470), but he was mostly standing and would have to take a break and sit down every fifteen or twenty minutes. (R. at 455). Needham's employer was very accommodating, giving him extra breaks and allowing him to go home if his pain was too bad. (R. at 471). Needham testified that he could not return to that job today because it is too strenuous and "you have to be quick." (R. at 471). He was unable to make the production requirements then, despite his employer's leniency. (R. at 471).

Needham testified that he worked for Pry-Pack from 2001 to 2005. (R. at 455). There, Needham was a forklift driver in shipping and receiving and was later reassigned to maintenance. (R. at 455-56). As a forklift driver, Needham was on his feet most of the day and probably had to lift ten pounds at the most. (R. at 456). In maintenance, Needham would make rounds, checking all the machines for oiling and lubrication. (R. at 456). He was on his feet and knees most of the day, having to crawl underneath the machines, but the position involved very little lifting, probably about two pounds. (R. at 456). Needham worked in maintenance for probably one year before he re-hurt his back. (R. at 456).

Needham testified that he worked construction for Anthony Morgan for about one year. (R. at 456). There, Needham put in basement walls and was responsible for setting up, pouring concrete, and tearing down. (R. at 456-57). He was on his feet most of the day doing heavy lifting. (R. at 457). Needham also worked a similar job at Lonnie Steele for one year, pouring concrete and installing basement walls. (R. at 457). Needham also testified that he worked at GNL Dream Homes, for which he would go to mobile home delivery sites and help set up the homes after delivery. (R. at 457). Needham would get the homes level and finish the insides,

including trim work and buttoning double homes together.  (R. at 457-58).  At this job, Needham was on his feet most of the day and probably had to lift about two pounds.  (R. at 458).  Needham also testified that he worked for ANF Foundations and True Wall Concrete, doing foundation work on commercial buildings (R. at 458); Shipman Concrete, doing basement foundations (R. at 458); and Bishop Footers, doing concrete basement walls  (R. at 458).

Needham testified that he was unable to work during the alleged closed period of disability because the pain in his lower back made him unable to perform his job duties.  (R. at 458).  He testified that he would frequently have to take time off or sit down for about thirty minutes to relax before he could get going again.  (R. at 458).  Needham testified that he experiences pain in both of his legs, in his upper leg muscles, and all the way around both hips, and that his tremors further affect his ability to work, sometimes preventing him from doing stuff with his hands.  (R. at 459).  These tremors have occurred for about two or three years.  (R. at 459).  Needham also testified that his thinking ability and hand-eye coordination affect his ability to work.  (R. at 460).  His mind starts wandering off, slowing his ability to do things.  (R. at 460).  Needham testified that he has never undergone back surgery (R. at 453), and that his pain is caused by his "spine pinching his sciatic nerve." (R. at 459).

Needham testified that he currently sees his heart and family doctors.  (R. at 460).  He is taking 40mg of Robestian for cholesterol, 325mg aspirin once a day, and if he is ever in chest pain, he takes nitroglycerin pills.  (R. at 460).  Immediately thereafter, Needham testified that he does not take anything for pain anymore because "they don't help."  (R. at 460).

Needham testified that he can stand for about fifteen minutes and can sit for about the same. (R. at 461).  Needham has to go back and forth between sitting and standing because of his back pain.  (R. at 461).  He can walk about two blocks before he has to stop because he is out of

breath and his back is hurting badly.  (R. at 461).  These breaks last about twenty to thirty minutes.  (R. at 461).

Needham testified that he used to love fishing, but he cannot do that anymore.  (R. at 462).  Needham has no hobbies or recreational activities.  (R. at 465).  He basically just watches television, although he reads through the newspaper occasionally.  (R. at 465).  Needham does not eat right and only gets two or three hours of sleep at night.  (R. at 462).  His back keeps him up at night.  (R. at 462).  Needham does not have any energy and has very low self-esteem.  (R. at 463).  He also has trouble concentrating.  (R. at 463).  Needham does not believe he has memory problems but sometimes things slip his mind.  (R. at 463).

Needham testified that he has been diagnosed with a low case of manic depression, and he believes he has the kinds of problems associated with that diagnosis.  (R. at 461).  A year and a half before the hearing, Needham saw a psychologist for about four months, and he had seen another prior to that time.  (R. at 462).  He suffers from crying spells and has had thoughts of suicide, which was the main reason he started seeing a psychiatrist.  (R. at 463).  A few years before the hearing, Needham tried to hurt himself, but he did not have to go to the hospital.  (R. at 463).  Needham is not currently taking any medications for depression and anxiety.  (R. at 463).  He has tried antidepressants but quit taking them because they made him meaner to his wife and son.  (R. at 463-64).

Needham testified that he gets along with others and tries to keep his anger issues to himself.  (R. at 464).  He sees his in-laws on occasion and has friends that come by to check on him periodically.  (R. at 464).  Needham no longer uses alcohol; he quit over a year and a half ago. (R. at 464).  He still smokes roughly a pack of cigarettes a day.  (R. at 464).  He primarily

spends his day sitting around.  (R. at 464).  He looks for work on the internet, and he might do about ten minutes of housework before he has to sit back down.  (R. at 464).

Needham testified that he does not drive anymore because he can hardly push the clutch (R. at 465), and he also has a problem with road rage.  (R. at 468).  Needham is able to take care of his personal grooming, but it takes time.  (R. at 465).  His son takes him grocery shopping and Needham usually uses a wheelchair to move through the store.  (R. at 465).  Needham can cook meals if they are quick.  (R. at 465).  It usually takes him about two hours to do the dishes.  (R. at 465).  It also takes a while for Needham to do laundry, and his son has to carry it in.  (R. at 465-66).  Needham's son also takes out the garbage.  (R. at 466).  Needham occasionally vacuums but does not do yard work.  (R. at 466).

Needham testified that he had to switch family doctors because Dr. Scutter dropped him as a patient.  (R. at 472).  Needham stated he was dropped because he sent his wife to pick up his prescription and added "I couldn't understand it."  (R. at 472).  Needham tried to go back to Dr. Scutter, but they said his insurance would not let him.  (R. at 472).  Needham has not seen Dr. Groysman since April of last year.  (R. at 473).  Dr. Jarmin stopped seeing Needham because of a negative drug screen revealing that Needham was not actually taking his medications.  (R. at 473).  Needham claims that he was taking the medication, just not the way he was supposed to, and that the doctor expected there to be more in his system.  (R. at 473).  Needham last saw Dr. Pinesta in March or February of 2009.  (R. at 473).

**2.  <u>Vocational Expert's Testimony</u>**

The vocational expert, Dr. Robert Breslin ("the VE"), testified that Aurora, Indiana would put Needham within the Cincinnati/Middleton primary metropolitan statistical area, which is comprised of counties in northern Kentucky, southwest Ohio, and southeast Indiana.  (R. at

474-75). There are currently 1,036,000 total jobs in that area and 136 million total in the U.S. economy. (R. at 475). These figures come from the three states' employment services and the Department of Labor's website. (R. at 475).

The VE testified that Needham has had two different jobs that would fall under the job title of industrial truck operator, DOT 921.683-0505. (R. at 475). This job is classified by the DOT as a medium, semi-skilled job with an SVP of three. (R. at 475). Based on Needham's testimony, the VE concluded that Needham performed that work at a light level. (R. at 475). Needham was not doing any significant lifting on either job, but he was standing and operating foot controls. (R. at 475). Needham has also worked as a construction worker, DOT 869.684-026, for a variety of different employers. (R. at 476). That work matches construction worker II, which is very heavy, unskilled work. (R. at 476). Additionally, Needham worked as a mobile home installer, DOT 869.684-010, a medium, semi-skilled job with an SVP of four. (R. at 476). Other than with regard to the exertional level of the industrial truck operator job, the VE testified that there is no other difference in the way Needham performed these jobs and the way they are customarily performed or classified in the DOT and SCO. (R. at 476).

The ALJ first questioned the VE regarding a hypothetical right-hand dominant person with a high school education, Needham's past work experience, and the following capabilities and limitations: he can lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently (R. at 476-77); he can stand and/or walk up to six hours in an eight-hour workday (R. at 476-77); he can occasionally stoop, kneel, crouch, and climb ramps and stairs (R. at 477); he cannot crawl or climb on ladders, ropes, or scaffolds, or work at unprotected heights (R. at 477); he cannot perform work requiring the forceful use of the lower extremities (R. at 477); and he is able to remember and carry out only short and simple instructions, and make only

simple work-related decisions, with no more than ordinary and routine changes in work setting or duties. (R. at 477).

In response to the ALJ's hypothetical, the VE testified that such an individual could perform none of Needham's past relevant work. (R. at 477). However, such an individual could perform unskilled work at the light level of exertion, such as cleaner/housekeeping, DOT 323.687-014. (R. at 477). There are 1,500 regional positions and 250,000 in the U.S. economy that could be performed by the hypothetical individual. (R. at 477). The individual could also perform the job of deli cutter, DOT 316.684-014, which is light and unskilled work with 1,200 regional positions and 100,000 U.S. positions. (R. at 477). The individual could also perform jobs like assembler of small products, DOT 706.684-022, and five other unskilled light assembly jobs. (R. at 477-78). There are 6,000 of these positions regionally and 675,000 in the U.S. economy. (R. at 478).

The ALJ then modified his hypothetical person by stating that the person was limited to lifting, carrying, pushing, and pulling ten pounds occasionally and five pounds frequently, and that he could only walk and stand for two hours in an eight-hour day. (R. at 478). In response, the VE testified that there are no jobs in the light category that the individual could perform. (R. at 478). However, there are some sedentary unskilled jobs in the regional and national economy, including atomizer assembler or other unskilled assembler jobs. (R. at 478). Atomizer, 706.684-010, is representative of four DOT codes for which there are 1,000 regional jobs and 157,000 U.S. jobs. (R. at 478). There are also sedentary unskilled production inspection jobs, such as DOT 669.687-014, with 300 regional and 36,000 U.S. positions (R. at 478). The ALJ further modified his hypothetical, stating that the individual would need to miss three workdays per month. (R. at 478). The VE testified that the absences would affect the individual's ability to

maintain employment. (R. at 478). It would be more absences than would be allowed. (R. at 479).

On cross-examination, Needham's counsel questioned the VE regarding a hypothetical individual with the capabilities and limitations set forth in Exhibit 12-F. (R. at 479). The VE testified that all light jobs would be eliminated for this individual. (R. at 479). The individual's standing and walking abilities would not be enough do light work. (R. at 479). Needham's counsel then modified his hypothetical to include Needham's hand tremor. (R. at 480). The VE testified that, depending on the degree of the tremor, it could affect the individual's ability to do sedentary unskilled assembly jobs and production inspection jobs. (R. at 480). Most unskilled sedentary jobs require good bilateral use of the hands. (R. at 480). The vast majority of production and inspection jobs also require handling and fingering. (R. at 481). The VE further testified, "If you credit Needham's testimony about the effect of his back pain on his ability to maintain a working posture, and his lifting limitations, as well as everything else he describes, he would be able to perform no work." (R. at 481).

On re-examination, the ALJ modified his original hypothetical individual to restrict the walking and standing limitation to two hours in an eight-hour workday. (R. at 483). The VE testified that the individual would still not be able to do Needham's past relevant work and would be limited to the unskilled, sedentary jobs identified above. (R. at 483). The fact that the individual has light lifting abilities, little ability to stand, and limitations on his ability to use his legs for foot controls, does not "give him any advantage beyond sedentary work." (R. at 483). In addition to the unskilled, sedentary jobs already identified, the individual would be able to work as an order clerk, DOT 209.567-014, which is a sedentary, unskilled position, with a SVP of 2 and a language level of 2, and normally involves using a telephone. (R. at 483-85). There

are 2,000 regional positions and 400,000 U.S positions. (R. at 483). The VE could not testify as to whether a person in special education could perform the mental and language duties of this position. (R. at 485). On cross-examination, Needham's counsel questioned the VE regarding a hypothetical individual who has difficulty with counting money. (R. at 486). The VE responded that trouble counting money would eliminate the order clerk job. (R. at 486).

## II. <u>DISABILITY AND STANDARD OF REVIEW</u>

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III. <u>DISCUSSION</u>

### A. THE ALJ'S FINDINGS

As reported in his decision, the ALJ found that Needham met the insured status requirements of the Social Security Act through December 31, 2011 (R. at 15), but that Needham

had engaged in substantial gainful activity – specifically, from March 2007 through January 2009 – since the alleged onset date. (R. at 15). The ALJ also found that Needham suffered from the following severe impairments: lumbosacral spine degenerative disc disease/spondylosis, coronary artery disease, status post April 8, 2008 stenting, and depression. (R. at 16). Although the ALJ found these impairments to be severe, he concluded that they did not, individually or in combination, meet or medically equal one of the impairments listed in the Code of Federal Regulations for Social Security. (R. at 17).

The ALJ assessed Needham with the residual functional capacity ("RFC") to perform the requirements of work activity consistent with the following capabilities and limitations: he can lift/carry/push/pull up to twenty pounds occasionally and ten pounds frequently; he can stand and/or walk for two hours in an eight-hour workday; he can only occasionally stoop, kneel, crouch, and climb ramps/stairs; he should not crawl, perform work requiring the forceful use of the lower extremities, climb ladders/ropes/scaffolds, or work at unprotected heights; and he is able to remember and carry out only short and simple instructions, and make only simple work-related decisions. The ALJ added that "any job should not require more than ordinary and routine changes in work setting or duties." (R. at 19). In making the above determinations, the ALJ found that Needham's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not credible. (R. at 20).

Based on Needham's assessed RFC, the ALJ found Needham unable to perform any past relevant work. (R. at 24). The ALJ also found the transferability of Needham's job skills to be immaterial to the determination of disability because, under the Medical-Vocational Rules, the ALJ found Needham not to be disabled, whether or not Needham had transferable job skills. (R. at 24). Ultimately, the ALJ considered Needham's age, education, work experience, and RFC

and determined that Needham is capable of performing other work that exists in significant numbers in the national economy. (R. at 24). The ALJ specified the jobs of assembler, DOT 706.684-030, inspector, DOT 669.687-014, and order clerk, DOT 209.567-014, as representative of this work. (R. at 25).

## B. NEEDHAM'S ARGUMENTS ON APPEAL

Needham challenges the ALJ's RFC assessment and the related step five determinations that Needham was capable of performing a significant number of jobs in the national economy during the requested closed period of disability, and that he remains capable of performing these jobs for the requested extended period of disability. Except as indicated below, all of Needham's claims concern both requested periods.

### 1. RFC Determination

Needham argues that substantial evidence fails to support the ALJ's RFC determination. If a claimant is found not disabled at step three in the sequential evaluation process, "we will assess and make a finding about the claimant's RFC based on all the relevant medical and other evidence in the case record." 20 C.F.R. § 404.1520(e). A claimant's RFC represents the most the claimant can still do despite his or her limitations, *Id.* § 404.1545(a)(1), and "it is used at step five…to determine if the claimant can adjust to other work." *Id.* § 404.1520(e).

#### a. Medical Evidence

Needham claims that the ALJ did not properly assess the medical evidence of record. "The RFC assessment must always consider and address medical source opinions." SSR 96-8p. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

First, Needham asserts that the ALJ erroneously discredited the January 18, 2006 opinion of Dr. Kennedy, a treating physician, who stated that Needham "does not appear to be a suitable workplace candidate at this time because of back pain." (R. at 23, 322). The ALJ gave "no weight" to this assessment because Dr. Kennedy "did not provide any specific functional limitations and did not provide any supporting medical evidence for this opinion." (R. at 23). Instead, the ALJ accorded significant weight to the February 23, 2006 opinion of Dr. Bastnagel, a non-treating physician, in assessing Needham's RFC. (R. at 23, 328-35).

Needham contends that, as a treating physician, Dr. Kennedy's opinion was entitled to greater weight in the ALJ's RFC determination. Although adjudicators generally give more weight to the medical opinions of a claimant's treating sources, 20 C.F.R. § 404.1527(d)(2), "[o]pinions on some issues…[are] reserved to the Commissioner because they are administrative findings that are dispositive of a case…". *Id.* § 404.1527(e). These include the determination about whether a claimant meets the statutory definition of disability. *Id.* § 404.1527(e)(1). Significantly, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that we will determine that [the claimant is] disabled." *Id.* Given the speculative nature of Dr. Kennedy's opinion, the ALJ was entitled to discredit it.

Needham also contends that the ALJ erred by rejecting Dr. Kennedy's opinion based solely on the opinion of a non-treating source. An ALJ may reject a treating physician's opinion "only for reasons supported by substantial evidence in the record," and a contradictory opinion of a non-treating source does not, by itself, justify that rejection. *Gundel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, the Court will not give any special significance to the source of an opinion on an issue reserved for the commissioner. 20 C.F.R. § 404.1527(e)(3). Therefore, in light of the finding above, Needham's contention fails to carry the day.

Moreover, and contrary to Needham's primary assertion, the ALJ rejected Dr. Kennedy's opinion because of its own internal flaws. (R. at 23). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. 404.1527(d)(3). Additionally, "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Here, the ALJ concluded that Dr. Kennedy offered no medical evidence in support of his opinion and set forth no specific functional limitations for Needham. (R. at 23). The Court finds the ALJ's evaluation of this evidence was not in error.

Second, Needham asserts that the ALJ failed to consider the March 25, 2004 report by Dr. Roberts discussing Needham's degenerative disc disease. It is well established that "an ALJ may not ignore an entire line of evidence that is contrary to [his] findings." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Rather, an ALJ must "sufficiently articulate his assessment of the evidence" to assure a reviewing court "that the ALJ considered the important evidence and to enable [the court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

Contrary to Needham's assertion, the ALJ discussed Dr. Roberts' findings in his credibility determination. The ALJ concluded that Needham "has positive findings of pathology upon diagnostic testing, but not to a level that would support his allegations." (R. at 21). In support of this conclusion, the ALJ acknowledged that "[a]n "MRI from February 2004 showed multilevel disc deterioration of the lumbar spine and borderline stenosis at L3-4." (R. at 21). Moreover, the ALJ asserted his rationale for discounting these medical findings, highlighting that "there was no compressive pathology and there was nothing [that was] surgically correctable." (R. at 21).

Third, Needham asserts that the ALJ cited no evidence to support his finding that Needham was not disabled for the requested extended period of disability. Needham contends the ALJ erred by not ordering an additional consultative examination. However, when evidence is needed to prove a claimant's eligibility for benefit payments, the claimant is responsible for providing that evidence to the court. 20 C.F.R. § 404.704; *see also* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). Further, SSR 96-6p only requires an ALJ to affirmatively secure an additional medical opinion when the ALJ believes that new evidence might cause the initial opinion to change. SSR 96-6p; *Buckhanon ex. rel. J.H. v. Astrue*, 368 Fed. Appx. 674, 679 (7th Cir. 2010). Needham highlights no evidence to support his contention that an updated opinion was warranted in this case, and the Court is unable to locate such evidence in the record.

### b. Credibility Assessment

Needham claims the ALJ did not properly assess Needham's credibility under 20 C.F.R. § 404.1529(c). Upon finding an impairment that could reasonably be expected to produce a claimant's symptoms, an ALJ must evaluate the intensity, persistence, and functionally limiting effects of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's capacity to do basic work activities. *Id.* § 404.1529(c)(1). This requires the ALJ to assess the credibility of the claimant's statements regarding the symptoms and their functional effects. *Id.* § 404.1529(c)(3).

Needham correctly asserts the ALJ erroneously considered Needham's failure to obtain treatment in his credibility determination. Although a claimant's statements may be given less credence if "the level or frequency of treatment is inconsistent with the level of complaints,"

SSR 96-7p, the ALJ must inquire as to the reasons for the inconsistency before drawing inferences about the claimant's symptoms and their functional effects. *Id.*; *see Craft v. Astrue*, 539 F.3d 668, 679 (7th 2008). Here, the ALJ did not provide the requisite inquiry as to why Needham did not seek additional medical treatment for his impairments. The ALJ only states that Needham "has not had an MRI examination since April 2005 and has not had an EMG," and that "[s]uch tests would be expected to be performed or repeated if the claimant's condition was at the severity he alleges." (R. at 21).

However, "[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Needham's failure to seek treatment is not the only basis for the ALJ's credibility determination. The ALJ considered various factors in assessing Needham's credibility, including his reason for leaving his employment in 2009 because the company moved to another State (R. at 21), his receipt of unemployment benefits (R. at 21), his inconsistent requests for medication refills (R. at 22-23), his negative drug screen for drugs that he was supposed to be taking and subsequent release by Dr. Jarman (R. at 22-23), and his observed behavior at the hearing. (R. at 22). Moreover, the ALJ properly articulated the role of each of these factors in discrediting the severity of Needham's symptoms. The totality of this evidence renders harmless the ALJ's failure to inquire as to any rationale Needham may have had.

Needham also asserts that the ALJ inappropriately considered Needham's temporary return to work as evidence of his continued ability to work. Needham relies on *Coulter v. Weinbereger*, 527 F.2d 224 (3d Cir. 1975), and *Wilson v. Richardson*, 455 F.2d 304 (4th Cir. 1972), for the proposition that unsuccessful work attempts demonstrate a claimant's inability, rather than an ability to engage in substantial gainful activity. (Pl.'s Br. 6); *see* 20 C.F.R. §

404.1574(a)(1); SSR 76-4a.  However, this proposition is misstated and is inapplicable in the present case.  Consideration by an ALJ of a claimant's efforts to work is permissible in assessing that claimant's credibility.  SSR 96-7p; *see Charles v. Astrue*, 2010 U.S. Dist. LEXIS 113713 (N.D. Ill. 2010) (citing *Stich v. Astrue*, 2010 U.S. Dist. LEXIS 7541 (E.D. Wis. 2010) ("[W]hen work is not substantial gainful employment, the ALJ can consider this a factor in his determination of credibility.").

Further, Needham's two-year employment from 2007 to 2009 is not an "unsuccessful work attempt" under the regulations.  *See* 20 C.F.R § 404.1574(c)(5) ("We will not consider work you performed at the substantial gainful activity earnings level for more than 6 months to be an unsuccessful work attempt regardless of why it ended…".).  Moreover, the ALJ did not consider Needham's work activity in his RFC determination, but rather Needham's reason for leaving that employment.  The ALJ stated, "Claimant was able to perform work activity at the substantial gainful activity [level], and stopped only because the plant moved," not due to disability. (R. at 21).  For these reasons, Needham's assertion is not persuasive.

Needham next asserts that the ALJ erred by considering Needham's receipt of unemployment benefits in assessing Needham's credibility.  A claimant's receipt of unemployment insurance benefits does not preclude the receipt of Social Security disability benefits.  SSR 00-1c (incorporating *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999)).  However, "[a] claimant's representations in seeking unemployment benefits may be relevant in assessing the credibility of [his] representations to the SSA."  *Richards v. Astrue*, 370 Fed. Appx. 727, 732 (7th Cir. 2010) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (affirming an ALJ's credibility assessment where decision to apply for unemployment benefits was one of several factors adversely affecting credibility).  What is more, the Court has reviewed

the memorandum from Chief Administrative Law Judge Frank A. Cristaudo – relied upon by Plaintiff – and believes it to be consistent with the analysis in *Schmidt*. As discussed above, the ALJ considered various factors in assessing Needham's credibility, and the Court is convinced that the ALJ's determination is not patently wrong.

Finally, Needham asserts that the ALJ erred in considering Needham's lack of crying and facial contortions at the hearing. (R. at 22). "Since the ALJ is in the best position to observe witnesses, we usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

> [Although we] doubt the probative value of any evidence that can be so easily manipulated as watching whether someone acts like they are in discomfort…[w]e have repeatedly endorsed the role of observation in determining credibility and refuse to make an exception…[where an ALJ] had an opportunity to observe [the claimant] for an extended period of time and could gauge whether [his] demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain.

*Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citations omitted). Although the ALJ's choice of words on this matter were insensitive, his use of such observation in assessing Needham's credibility does not constitute reversible error.

## 2. Application of RFC

Needham argues that the ALJ erroneously concluded that Needham's RFC would allow Needham to perform other work in the national economy. At the fifth and final step in the sequential evaluation process, an ALJ considers claimant's assessed RFC and vocational factors of age, education, and work experience to determine if claimant is capable of adjusting to any other work. 20 C.F.R. § 404.1520(a)(4)(v). If an adjustment is possible, and the identified other

work exists in significant numbers in the national economy, the ALJ will find claimant not disabled. *Id.* § 404.1560(c)(1).

First, Needham claims that the ALJ failed to include Needham's hand tremor in his hypothetical question to the VE.[1]  The United States Court of Appeals for the Seventh Circuit has stated:

> Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record.  The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations.  An exception therefore exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them.

*Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (internal citations omitted); *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("We sometimes have assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that VE independently reviewed the medical record or heard testimony directly addressing [the omitted] limitations.").

Here, the VE was present for Needham's testimony, which included statements concerning Needham's tremor; the VE also reviewed exhibits from Needham's case file. (R. at 459, 475).  Although the exception to the general rule does not apply where "VE's attention is focused on the hypotheticals and not on the record," *O'Connor-Spinner*, 627 F.3d at 619, Needham's counsel also specifically addressed Needham's tremor on cross-examination of the VE.  (R. at 480-81).  The VE subsequently testified to Needham's capability to perform other

---

[1]  In his reply brief, Needham contends that the ALJ also failed to consider Needham's hand tremor in assessing Needham's RFC.  (Pl.'s Rep. Br. 4).  As Needham did not raise this issue in his preliminary brief, the Court will not consider it as part of Needham's challenge to the ALJ's decision.  *See United States v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006) ("Arguments made for the first time in a reply brief are waived.")

work. (R. at 483-85). For these reasons, ALJ's failure to include Needham's tremor in the hypotheticals posed to the VE is not cause for remand.

Second, Needham claims that the ALJ erred in finding that Needham's assessed mental limitations would enable him to perform the job of order clerk. In making this determination, the ALJ relied on the VE's testimony, in accordance with 20 C.F.R. § 404.1566(e). (R. at 25); 20 C.F.R. § 404.1566(e). The VE testified that a hypothetical person with Needham's RFC could perform some sedentary unskilled jobs in the regional and national economy, including that of order clerk as defined by the Dictionary of Occupational Titles ("DOT"). (R. at 483). Impliedly, Needham claims that the ALJ's reliance on the VE's testimony was improper because that testimony was based on an RFC that is incompatible with the DOT definition of order clerk, DOT 209.567-014. Before relying on a vocational expert's testimony to support a determination of non-disability, an ALJ has an "affirmative duty" to elicit "a reasonable explanation" for any apparent conflict between that testimony and the DOT. *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008); SSR 00-4p. Here, the ALJ initially satisfied this burden by asking if the VE's testimony was consistent with the information contained in the DOT (the VE answered in the affirmative). (R. at 483-84).

Needham asserts that the Reasoning Development Level required for the job of order clerk exceeds Needham's reasoning capabilities as assessed by the ALJ. The ALJ found Needham capable "to remember and carry out only short and simple instructions, and make only simple work-related decisions." (R. at 19). The ALJ further concluded that "[a]ny job should not require more than ordinary and routine changes in work setting or duties." (R. at 19). In contrast, the job of order clerk has a Reasoning Development Level of 3, DICOT 209.567-014, 1991 WL 671794, requiring the ability to "[a]pply common sense understanding to carry out

instructions furnished in written, oral or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." DICOT, Appendix C, 1991 WL 688702.

Although there exists some variation in how courts compare a claimant's RFC to the DOT's Reasoning Development Level, *compare Masek v. Astrue*, 2010 U.S. Dist. LEXIS 39501, 63-64 (N.D. Ill. 2002), *with Simms v. Astrue*, 599 F.Supp.2d 988, 1007-08 (N.D. Ind. 2009), *and Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), the Court believes that the discrepancy in this case may have required further inquiry by the ALJ. Based on the ALJ's RFC findings, a Reasoning Level 1[2] or 2[3] is likely more appropriate.

However, the Commissioner claims that Needham waived this argument by not challenging the VE's testimony at the hearing. (Def.'s Br. 14-15). "[A]n ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing." *Overman*, 546 F.3d at 465. "[I]f the basis of the VE's testimony is questioned at the hearing, "then the ALJ should make an inquiry…to find out whether the purported expert's conclusions are reliable." *Id.*

Needham counters that his counsel challenged the alleged discrepancy by cross-examining VE regarding Needham's trouble counting money. (R. at 486). The Court disagrees. As is evident in the discussion below, a claimant's Reasoning Development Level and Math Development Level are two different measurements of a claimant's broader General Educational Development (GED). *See* DICOT, Appendix C, 1991 WL 688702. Because Needham's counsel

[2] Reasoning Development Level 1: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DICOT 209.567-014, 1991 WL 671794.

[3] Reasoning Development Level 2: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DICOT 209.567-014, 1991 WL 671794.

only implicated Needham's Math Development Level on cross-examination of the VE, that act is insufficient to preserve Needham's claim for appeal.[4]  Moreover, as is discussed further below, Needham remains capable of performing other work that exists in significant numbers in the national economy without the inclusion of order clerk positions.

Needham also asserts that the Math Development Level required for the job of order clerk exceeds Needham's math capabilities.  The DOT defines the job of order clerk as having a Math Development Level of 1, DICOT 209.567-014, 1991 WL 671794, which includes the ability to "[p]erform four basic arithmetic operations with coins as part of a dollar."  DICOT, Appendix C, 1991 WL 688702.  Dr. Kurzhal reported that Needham had difficulty counting money.  (R. at 297).  Additionally, the VE testified on cross-examination by Needham's counsel that an individual with trouble counting money could not perform the job of order clerk.  (R. at 484-86).  In light of the fact that both the VE and the DOT define order clerk as requiring the ability to count money, the ALJ should have addressed it in his RFC determination, which he failed to do.  The ALJ may have had cause to discount Needham's testimony, but without even a mention, the Court is "left to wonder" whether Needham's difficulty counting money was considered at all.  *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

Despite the ALJ's error, remand is not warranted on this issue because of the ALJ's finding that Needham remains capable of performing other work that exists in significant numbers in the national economy without including the job of order clerk.  In addition to the job of order clerk, the ALJ found, based on the VE's testimony, that Needham was capable of

_____

[4] The Court notes that "a claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occurred," and that a claimant may argue on appeal "that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance…".  *Overman*, 546 F.3d at 463.  However, Needham has made no argument to that effect, and the Court finds Needham's cross-examination of the VE concerning Needham's Math Reasoning Level to be insufficient for this purpose.

performing the representative jobs of assembler, DOT 706.648-030 and inspector, DOT 669.687-014. (R. at 25, 478). The VE testified that 1,300 of these jobs existed locally, and 193,000 nationally. (R. at 25, 478). "As few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (internal citations omitted). Therefore, the ALJ's findings are still sufficient to support his determination that Needham is not disabled.

## IV. CONCLUSION

For the reasons stated herein, the final decision of the Commissioner of Social Security in this case is **AFFIRMED**. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: 06/01/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

William Edward Jenner
JENNER AUXIER & PATTISON LLP
wjenner@wjennerlaw.net, jdeaton@wjennerlaw.net, klynch@wjennerlaw.net,
chuff@wjennerlaw.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, pearlie.wadlington@usdoj.gov, lin.montigney@usdoj.gov